May it please the Court, this action was commenced in an Oregon state court for the purpose of quieting title to a building in Heppner, Oregon containing six apartments. The title had been encumbered with obligations to the predecessor of the Rural Housing Service. The first obligation had been incurred in 1975 in the original construction and the present owner acquired title in 1984. She and the agency, when she acquired title, changed the original obligations and as changed she assumed the balance and created a much smaller obligation. Counsel, since we don't have a whole lot of time, can we cut through to a couple of points? Sure. By my reckoning the loan documents go through respectively to 2015 and 2034. You refer a lot to the mortgage slash deed of trust. That's the security instrument, but the obligation is represented by the notes, is it not? Except that the documents were totally integrated. That doesn't matter. That doesn't matter. Well, the obligations were evidenced by them. The obligation to pay money was evidenced by the notes. As a represents the obligation. The deed of trust or mortgage is the security for the payment of the obligation. So in this case, your client wanted to pay the obligation represented by the notes before 2015 and 2034. Is that an accurate statement? Well, she wanted to pay the obligation before that date, yes. She Okay, now why is that not a prepayment? Because under the definition of prepayment prescribed by the Department of Agriculture following the ELIFTA, it provided that prepayment shall be that payment made before the originally scheduled maturity of the obligation. Okay, well let's take your point on the first document, but not the second one. 2034 was signed by your client and that was never changed, right? You're talking about the first mortgage? No, the second. The second deed of trust, yes. And so that one, I know I understand what you're trying to do with the first one, but the second one was signed by your client and that goes to 2034. And in order to get clear title, you have to remove both, do you not? The answer to that is no to the first question and the answer, I mean the answer to your first question is no. And the reason why it's no is this. That that horizon date was established on the obligation for interest was created by a separate statement called an interest credit agreement, which prescribed that the interest would be at the rate of 1%. And at the rate of 1%, the installments would have matured, the installments would have matured the obligation well before the expiration of the 20 years for the restricted use. That being the case, the obligation did not mature at the horizon date provided by the note, because the note provided a different rate of interest than was prescribed by the obligation. That is an unusual construction. Well, take it this way. The original note provided for an interest rate in one case of 8.5% and another case of almost 12%, okay? And based upon that, the horizon date for the eventual payment would have been many years out, 40 or 50 years. But the counsel, is it not true that the 2034 note was never modified? Never modified. Well, I contend it was by the contemporaneous agreement. I understand that, but the note itself, do you agree that the writing, we'll call the note, was never modified? I thought he said no. He went off somewhere else. No, no, no, I'm saying it was modified by the contemporaneous agreement that provided for interest at 1%. Yes. So you're saying that the note in the second instance was two pieces of paper at least? There's no question about it. There were two pieces of paper. One was called an interest credit agreement. One was called the note. The interest credit agreement, which was applicable to this loan, was 1%. Not 12%, 1%. And if the note would be retired at 1%, then it would have been retired long before the restricted use provision would have expired. I practiced real estate law for 37 years, and that is one of the most creative arguments I have ever heard for a description of a note. I don't know whether to thank you or not. Take it as a compliment from California. You're really good. Well, there was a reason for that, Judge. Can I ask you? There was a reason for that, though, in this case. I'm not nearly as knowledgeable or as clever as Judge Smith when it comes to these things, but I wanted to ask you about paragraph 7 of the interest credit and rental assistance. Paragraph 7 of what, Judge? The interest credit agreement. It says, no terms or conditions of the note, I'm going to skip some words, shall be affected by this agreement except as expressly set forth herein. So what is it about this agreement that you think expressly affects the terms of the note? Since the interest credit agreement itself says it doesn't change the terms of the note unless it says it does. I'm sorry, I'm not hearing you adequately. You're referring to the loan agreement, and you're referring to paragraph 7? No, I'm referring to the interest credit page 37. Thank you. Page 37. Got it. Paragraph 7, about three-quarters of the way down the page. No terms or conditions of the note are any related, yes, shall be affected by this agreement, except as expressly set forth herein. I'm asking you, what in this agreement expressly changes the terms of the note in the way that you are asking us to interpret it? Thank you. It's in paragraph 2. Subject to the provisions of this agreement, the government will compute interest on the borrower's account at the rate specified for the plan of operation selected below Plan 2, 1%. Where does it refer to the note? It doesn't expressly refer to the note. That was the same question I was trying to find. Well, if we can, or if you would be willing to agree, that this interest credit agreement does provide for an interest rate at 1%, if you would agree to that, that then clearly, it seems to me, modifies the provision of the note that provides for interest at 12%. I don't see how you can read it any other way. And as a matter of fact, that's precisely the interest rate that was applied. 1%, not 12, 1%. I assume that in paragraph 1 says it supplements a promissory note, describes what this agreement is relating to, is the note, correct? Yes, supplements it. Thank you. That's another provision of that interest credit agreement. It does provide that it does, in fact, supplement a promissory note. And so at that rate of interest, the note would have been paid. In other words, it's not a prepayment. But that's a reference to the first note, is it not? Not the second? No, this is in reference to the second note. Okay, so then what happens with the first one then? Well, because the first note was, there was a separate interest credit agreement with respect to the first note that said exactly the same thing. Counselor, I think we have your position and you're almost out of rebuttal time. So I think we'll hear from the government. You want me to quit? Okay. Temporarily, sir. Only temporarily. As the lawyer once said, if you might quit, now do I win, you know. May it please the Court. Suzanne Bredis on behalf of the United States. I want to start first with what this Court was dealing with on my opposing counsel's opening argument, which is this question about the maturity date. And the first point that I'd like to point out is that this is a new argument raised for the first time on appeal. Plaintiff concedes at reply brief at page 8 that this position, this argument, was not raised before the district court. Because it wasn't raised before the district court, it is not properly before this court to decide. And so because it is waived, it's not a question before the court. Rather, the question that is before the court is whether the district court abused its discretion in deciding that quiet title was an inappropriate remedy here after balancing the equities in this case. And in looking at the equities and balancing the equities, what the district court relied upon and focused on was what remedy is available to plaintiff in this situation. First of all, there's no dispute here that by complying with the terms of ALLIPA, the government breached its contract with the plaintiff. The original contract had a provision in it which permitted prepayment at any time. And by passing ALLIPA, Congress explicitly repudiated that provision and put restrictions on the ability of owners to prepay and remove their properties from low-income housing projects. Counsel, as a matter of equity, I mean, we talk about quieting title. It's an equitable action, is it not? It is. So in this particular case, if the plaintiff has a legal remedy that undercuts an ability to get an equitable relief, right? That's correct. And in this case, they can, what, go to the court of claims? There's two paths that are available. Actually, two remedies that kind of intertwine with each other. We have to start with the statute itself, which even though it restricts prepayment, it doesn't prohibit prepayment. And so we start there, and that's where the district court started. By following the terms of ALLIPA, a property owner in the position of plaintiff who no longer wants to run their property as a low-income housing project, well, they can't immediately prepay. They can go to the agency and initiate the process in which they can put their property up for sale to a qualified buyer. The property will go up for sale at a fair market price. A qualified buyer is either a government agency or a nonprofit organization who will in turn agree to continue to run the property as low-income housing. The property needs to go under the statute. The property goes on the market for six months. If no qualified buyer comes forward, then the property owner is permitted to prepay and to take title to the property unencumbered and remove the property from low-income housing project. In spite of the delay, the government is arguing that the six-month delay still yields a legal remedy that is sufficient. That's right. I understand the equitable remedy of quiet title. That's correct. And the government does recognize that there's some burden that's placed on property owners for going through the process of ALLIPA and for putting the property up for sale as low-income housing, encumbered as low-income housing, instead of being able to just sell it with a free and clear title. And that's where this Court's decision in Kimberly, where Franconia, where Atwood-Leisman come into play and permit the plaintiff to then go to the Court of Claims, Judge Smith, as you said, and get back, get compensated for whatever financial damage, whatever financial burden, having to go through this additional process and sell the property as encumbered with the low-income housing encumbrance. Basically, here, in what the government's doing, the government says, we'll provide a subsidized mortgage for you. You're going to be able to get this money for a whole lot less money than you would commercially. But the deal is, you've got to operate it as a low-income housing property. If you change your mind and you want to get out of it, you cannot take advantage of the low-income benefits, i.e., the low mortgage, sell it to somebody else, make a whole lot of money off of it, and still take advantage of that. There's a process by which you have to go through to try to sell it to somebody else who will continue to provide the benefit the government wants, and they get the benefit of it. If you can't do it after six months, then fine, we say, hey, okay, we're going to let you do this. But that provides the remedy under the statute, doesn't it? That's exactly right. And that's what Congress was trying to do here. What they found in 1987 was that they had given all of these mortgages out and that people were prepaying, and the stock of low-income housing was going down. So the country's poor didn't have a stock of housing to be able to use. And so to try to stem that. One issue, though, with ELIPA. With respect to the first note, which I think was in place before ELIPA was passed, what right does Congress have to, in effect, retroactively amend the terms of the first note? Actually, both notes were in place before ELIPA was passed, yes. What right does Congress have to do that? Well, under Franconia, the Supreme Court said that this was a repudiation of these loans. And basically, while the government can repudiate its contracts, it has a responsibility to take, to pay for damages, whatever damages result from that breach of contract. And so Atwood-Leisman carried that forward, which is a court of claims case in which the plaintiffs went forward and it was found on summary judgment as a matter of law that they had a right to money damages because of this breach. Which is illegal, not an equitable remedy. That's correct. So the question, as I said before this court, is whether the district court abused her discretion in determining that quiet title was not appropriate here as an equitable remedy. Because she considered all the remedies that were available. She considered the landscape. She balanced the equities here. The government submits that the district court did not abuse its discretion and that that decision should be upheld. Unless the court has any further questions. I don't believe so. Thank you. Mr. Schroeder? I'd like to make two quick points. One is as to whether this is a new argument. The answer is no. It's not a new argument. The plaintiff insisted all along this was not a prepayment. She insisted all along that the restricted use had expired. The government, however, failed to establish the application of the act by establishing that this was, in fact, a prepayment. They failed to establish the fact that the, for some reason, the regulation that bound them that defined what a prepayment was, was inapplicable or should be applied differently. Secondly, this was a new deal. I have no problem at all with Judge, with his comments with respect to the purpose of ELIFTA. This is not a case that violates that purpose. Before ELIFTA was passed, these parties, the government and the plaintiff, agreed to a 20-year restrictive covenant. Not that it should be, not that the restriction should apply until the debt was paid, but it was to apply for 20 years. The 20 years was fulfilled, and the plaintiff fulfilled that. The 20 years was in the deed of trust, not in the note, right? The 20 years was provided by the trust, by the agreement, right. Not in the note. But the note, well, okay, we've gone down that road before. Finally, let me say this, that the, that this idea that the government was totally subsidizing in this case is incorrect. The plaintiff subsidized this to the greater extent than the government in a variety of ways that were described in the brief. And I don't see there's any point in continuing that line of argument. The Kimberly case, and let me say one final thing, and that is simply this, that the government defended this not on the basis that the act was a mandatory substitution for quiet title. It could not be. And the reason it could not be is because the only way that these encumbrances could be lifted would be for the plaintiff to sell to a nonprofit or a public agency, or if they declined to purchase at an administratively determined price. Only then would the, only then would the encumbrances would be lifted. Nor would, nor would a dollar damage lift the encumbrance. This is not a Fifth Amendment taking case where you buy the property. This is a breach of contract problem. Thank you, Counsel. You have exceeded your time. We appreciate very much the arguments of both parties. The case just argued. Counsel, you should have lived 120 years ago when the Supreme Court enforced the contract clause. Thank you very much. Thank you, Mr. Schroeder. We'll next hear argument in the United States versus Garcia-Romero. Thank you.
judges: Graber, Fisher, Smith